# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-3911

VIRGIL HALL, III,

*Petitioner-Appellee,*

*v.*

MICHAEL ZENK, Superintendent,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:09-CV-506—**Jon E. DeGuilio**, *Judge*.

ARGUED JUNE 8, 2012—DECIDED AUGUST 29, 2012

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* In February 2001, Virgil Hall III was convicted in an Indiana state court of murdering his stepson. Shortly after his verdict came down, Hall discovered that one of the jurors in his case had a son that was a fellow inmate of his. Hall further learned that before his trial, the juror's son informed the juror that Hall was likely innocent, but during the trial, the juror found out that his son and several co-inmates

changed their mind about Hall, and thought him guilty. The juror relayed this extraneous information to several jurors. Upon making these discoveries, Hall filed a motion to correct error, arguing that he was not afforded an impartial jury that decided his case strictly upon the evidence presented. The state court rejected Hall's motion, and Hall was further denied at the appellate level on direct appeal. After seeking collateral relief in Indiana to no avail, Hall filed a habeas petition in the Northern District of Indiana, arguing, *inter alia*, that the State should have carried the burden of proving that the extraneous information that reached his jury was not prejudicial. The district court granted Hall's habeas petition based on our precedent of *Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005), and the State now appeals. For the following reasons, we vacate the ruling of the district court and remand for further proceedings.

## I. Background

In December 1999, Hall married Kelli Fetterhoff and became the stepfather of Fetterhoff's kids—Peyton Fetterhoff (age 3) and Hunter Fetterhoff (age 5). Hall and Fetterhoff also had a child together in April 2000—Devon Hall. In May 2000, Fetterhoff went into town to run errands with Devon, and Hall was left with Hunter and Peyton. Around 11:00 a.m., Hall telephoned the deputy chief of the fire department, asking him for assistance with his stepson Peyton, who, Hall claimed, fell off a swing. When the deputy chief arrived at Hall's home, he realized that Peyton was very severely injured, and

told Hall to call an ambulance. When Peyton arrived at the hospital, a doctor discovered that he had several serious injuries, including a fractured skull and damage to his torso, and that he was lethargic, unresponsive to commands, and had deviated eyes. Peyton was therefore airlifted to a hospital in Indianapolis. He eventually died due to swelling in his brain.

An autopsy on Peyton's body was conducted, and it revealed that he suffered at least three separate injuries to his head, a severe injury to his chest, another to his abdomen, a sixth to his scrotum, and a laceration to the ligament that holds his head to his cervical spine. Hall was eventually charged with murder and neglect of a dependent resulting in serious bodily injury.

At trial, Hall changed his story. He suggested that Peyton was sitting on a workbench while Hall was fixing his weed eater and that he accidentally knocked Peyton off the workbench when he yanked on an extension cord to eliminate a knot. He also claimed that Peyton hit a dog cage before he fell to the ground. He explained his prior story about Peyton falling off a swing by suggesting that he did not want to be viewed as a bad father for having knocked his stepson off of a workbench accidentally.

Several doctors testified at trial, debating the possibility that Peyton's injuries could have been caused by the fall described by Hall and the likelihood that punches or kicks caused the injuries instead. Hall was eventually found guilty of both murder and neglect and sentenced to sixty-five years in prison. After the trial, Hall filed a

motion to correct error due to jury misconduct. Hall attached an affidavit to his motion suggesting that a juror was given improper information about Hall's trial from several third parties. More specifically, the affidavit suggested that David Daniels, a juror, had a son that was incarcerated at the same facility as Hall, and that Daniels' son told Daniels at the beginning of trial that he thought Hall was innocent. Further along in the trial, Daniels overheard his wife tell another family member that their son and several other members of the cell block no longer believed Hall to be innocent. The affidavit submitted by Hall to the court also suggested that Daniels shared this information with the rest of the jury. In response to this motion, the State submitted several affidavits in an attempt to cast doubt on whether the extraneous information ever actually reached the jury, but all courts to consider this matter have determined that the information did reach at least some jurors. The State has not, at this stage, given us any reason to doubt those findings.

After filing his motion to correct error, Hall moved to depose all members of the jury, but the trial court denied this motion, and an interlocutory appeal on the matter to the Court of Appeals of Indiana affirmed this decision. The Indiana courts' denials of Hall's request to depose the jury were based on two points: (1) under both Indiana and federal law, jurors cannot testify about the basis for their decision or whether extraneous information had an impact on their decision; and (2) there was already evidence that the extraneous information actually reached the jury by way of Daniels.

Hall's case was therefore sent back to the Indiana trial court for a hearing to determine whether the extraneous information caused him prejudice. The court ruled that extrinsic communications concerning a contested matter did, in fact, reach the jury, but that Hall was not prejudiced. On direct appeal, Hall argued that the State should have had the burden to prove that the extraneous information inserted by Daniels did not prejudice Hall. The appellate court expressed its discomfort with Indiana law, suggesting that the burden should be on the State to prove that improper, extraneous information that reaches the jury did not cause prejudice to a defendant. The court nonetheless believed itself to be bound by Indiana Supreme Court precedent, which stated that the burden is on the defendant to show that he was actually prejudiced by an intrusion upon the jury before a new trial can be granted. *See Griffin v. State*, 754 N.E.2d 899, 901 (Ind. 2001). Because the appellate court was not permitted to consider any testimony from jurors regarding their perception of the effect of the extraneous information, the court believed that it had a dearth of information upon which to rule, and found against Hall simply because the burden was on him to prove prejudice.

Hall's next move was to seek post-conviction relief through Indiana's court system. He exhausted all possible post-conviction avenues in Indiana, and then filed a habeas corpus petition in the federal district court in the Northern District of Indiana. Hall included several arguments as to why his conviction should be thrown out, but only one is pertinent to this appeal.

Hall argued that the Indiana courts contravened clearly established federal law handed down by the Supreme Court (as required for a habeas petition under 28 U.S.C. § 2254) when they gave Hall the burden of showing that improper communications with a juror in his case resulted in actual prejudice. He argued that *Remmer v. United States*, 347 U.S. 227 (1954), made it constitutionally necessary to place the burden on the State to show that improper communications with a juror were not prejudicial to the defendant, and that our case of *Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005), dubbed *Remmer*'s holding to be "clearly established." The district court found that it was hard to justify a finding that *Remmer*'s holding was still the clearly established law in this area, given the language of subsequent Supreme Court cases as well as a circuit split on the continued viability of *Remmer*, but that *Wisehart* nonetheless required the district court to deem the holding clearly established. Thus, according to the district court, the Indiana courts ruled contrary to clearly established federal constitutional law. Further, the district court found that the error was not harmless, and thus Hall's habeas petition was granted. The court also held that even though *Remmer* only requires a hearing to determine prejudice, during which the State carries the burden of proof, the Court of Appeals of Indiana observed that the State would not have been able to carry its burden if it had needed to do so. The district court considered this finding reasonable, and thus deferred to the state court in granting Hall either his release or a retrial. The State now appeals, asking us to find that the

Indiana courts did not contravene clearly established federal law.

## II. Discussion

In reviewing rulings on a petition for habeas relief, we are restricted to the question of whether a conviction violated "the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also* 28 U.S.C. § 2254(a). We review all questions of law de novo and all factual determinations for clear error. *Atkins v. Zenk*, 667 F.3d 939, 943 (7th Cir. 2012). Our review is guided, however, by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), since Hall's trial took place after AEDPA was enacted. Despite an argument to the contrary in the district court, Hall concedes that the Indiana courts ruled on the merits on his current constitutional challenge to his conviction, and thus this habeas case falls under 28 U.S.C. § 2254(d). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is contrary to clearly established federal law if it either applies a rule that contradicts a prior Supreme Court case, or if it reaches a different result than the Supreme Court has reached on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). In considering whether a state court's decision involves an unreasonable application of clearly established law, we look not to whether the state court ruled incorrectly, but rather whether the application of law is unreasonable. *Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir. 2002). The application of a law is reasonable if it is "at least minimally consistent with the facts and circumstances of the case." *Schaff v. Snyder*, 190 F.3d 513, 523 (7th Cir. 1999) (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)). Because Hall's challenge is a constitutional one, he must also convince us that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict" in order to have his habeas petition granted. *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Hall believes that he has cleared these hurdles. He asserts that under the Sixth and Fourteenth Amendments to the Constitution, he had a right to an impartial jury at his murder trial, and that his right was violated when extraneous third-party communications reached

the jury, resulting in the possibility that the jury considered more than just the evidence presented at trial. Hall further argues that under *Remmer*, a state is constitutionally required to hold a hearing examining the prejudicial effect of such third-party communications, and that a presumption of prejudice must attach to this type of extraneous information (hereinafter referred to as the "*Remmer* presumption"). Hall's state trial court did provide him with a hearing examining the prejudicial effect of the information conveyed to his jury by Juror Daniels, but he argues that the court's failure to presume prejudice during that hearing was nonetheless a violation of his constitutional rights. He maintains that we have already impliedly held the *Remmer* presumption to be clearly established constitutional law in *Wisehart*, and that thus he is entitled to a grant of his habeas petition.

The State, conversely, does not believe that the *Remmer* presumption is clearly established federal law applicable to the states. It contends that Supreme Court cases subsequent to *Remmer* have abrogated the presumption, and that even if we disagree on that point, a circuit split on the continuing vitality of the *Remmer* presumption illustrates the fact that it is not clearly established law. In the alternative, the State argues that the *Remmer* presumption does not help Hall at this procedural posture. The State explains that a habeas petitioner must show that he was likely prejudiced by a state's constitutional error to succeed on a habeas petition, which is essentially the showing that the state trial court required of Hall when it did not presume

prejudice in his favor. Thus, according to the State, Hall is in the same position here that he was when the state court denied his claim of presumed prejudice, and his petition must be denied.

As the parties' arguments illustrate, the questions we must answer are three-fold: (1) whether the *Remmer* presumption is clearly established federal law applicable to the states; (2) if it is, whether the Indiana courts acted contrary to this clearly established rule, or applied it unreasonably, in placing the burden to show prejudice from extraneous communications on Hall; and (3) whether this error had a substantial and injurious effect on Hall. We begin, therefore, by seeking to determine whether the *Remmer* presumption is clearly established federal law applicable to the states. In considering whether clearly established federal law exists with respect to a particular issue, we may only consider the holdings of the U.S. Supreme Court; neither the case law of the circuits nor dicta found in Supreme Court cases can establish federal law that binds the states for the purposes of habeas review. *Williams*, 529 U.S. at 412. The fact that a circuit split exists on an issue may be indicative of a lack of clarity in the Supreme Court's jurisprudence, *cf. Forman v. Richmond Police Dep't*, 104 F.3d 950, 960 (7th Cir. 1997), but a split is not dispositive of the question, *see Morgan v. Morgensen*, 465 F.3d 1041, 1046 n.2 (9th Cir. 2006) ("The fact that there was a potential circuit split on this issue does not preclude our holding that the law was clearly established . . . ."); *Williams v. Bitner*, 455 F.3d 186, 193 n.8 (3d Cir. 2006) ("Even if our sister circuits had in fact split on the issue, we would not

necessarily be prevented from finding that the right was clearly established."). *But see Evenstad v. Carlson*, 470 F.3d 777, 783 (8th Cir. 2006) ("When the federal circuits disagree as to a point of law, the law cannot be considered 'clearly established' . . . .").

There is no doubt that *Remmer* itself established a presumption of prejudice applicable when third-party communications concerning a matter at issue in a trial intrude upon a jury. *See Remmer*, 347 U.S. at 229. In *Remmer*, a criminal case involving the willful evasion of taxes, a juror informed the judge post-verdict that an unnamed third party suggested that the juror could profit by ruling in favor of the defendant. *Id.* at 228. The judge asked the FBI to investigate, and they determined that the seeming bribe was made in jest. *Id.* This investigation was conducted ex parte, and the defendant was not aware of its existence until after the trial had ended, at which point he moved for a new trial and lost. *Id* at 228-29. The defendant appealed to the Supreme Court, which held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id*. at 229. The court further ruled that in these situations, a hearing is necessary, in which the State must carry the heavy burden of showing that the contact with a juror was harmless. *Id*. The Court remanded to the district court, but the case eventually made its way back up to the Supreme Court, at which time the Supreme Court clarified that "[i]t was the paucity of information

relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner which, in our view, made manifest the need for a full hearing." *Remmer v. United States*, 350 U.S. 377, 379-80 (1956).

We have no doubt that if *Remmer* still applies with full force today, Indiana acted contrary to its clear holding.[1] The State, however, cites to two more recent Supreme Court cases that, according to the State's readings, undercut the presumption that was established in *Remmer*. The first is *Smith v. Phillips*, where a juror applied for a job in the office of the prosecutor trying the very case that the juror was hearing. 455 U.S. 212 (1982). In *Phillips*, the Court confirmed that *Remmer* hearings are required to alleviate concerns of juror partiality, *id.* at 215 ("[T]he remedy for allegations of juror partiality is a hearing . . . ."), and that this requirement is rooted in the federal Constitution, *id.* at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences . . . . Such determinations may properly be made at a hearing like that ordered in *Remmer* . . . ."). According to the State, however, the Court also cast doubt on whether and when the State has the burden to show harmlessness in a *Remmer*

---

[1] This assumes, of course, that the *Remmer* presumption is a constitutional necessity, and thus is a rule that must be followed by the states—a matter which is discussed below.

hearing, stating, "This Court has long held that the remedy for allegations of juror partiality is a hearing in which the *defendant* has the opportunity *to prove actual bias*." *Id*. at 215 (emphases added). The focus of *Phillips*, however, was the defendant's mere right to a hearing, as opposed to an automatic new trial, when jury bias is suspected. *See id.* at 215-18. The Court even mentioned, not disapprovingly, its former characterization of an attempted bribe as "presumptively prejudicial," thereby supporting the notion that a presumption of prejudice still existed in at least some, if not all, situations involving a potential lack of jury impartiality. *Id.* at 215-16. This implication is bolstered by the dissent's offhand, seemingly uncontroversial comment that the Court, in the past, had "strongly presumed that contact with a juror initiated by a third party is prejudicial." *Id*. at 228 (Marshall, J., dissenting). Thus, while it may be cogently argued that *Phillips* narrowed the *Remmer* presumption by suggesting that it did not apply to the circumstances presented in *Phillips*, it did not eliminate the presumption altogether.

This interpretation of *Phillips* finds support in the reasoning of the more recent case of *United States v. Olano*, 507 U.S. 725 (1993). In *Olano*, alternate jurors were permitted to sit in on the jury's deliberations in contravention of the Rules of Criminal Procedure. *Id.* at 728-29. The Court analogized this factual scenario to *Remmer*, in that both involved "outside intrusions upon the jury for prejudicial impact." *Id*. at 738. In keeping with *Remmer* and *Phillips*, the Court observed that intrusions upon the jury can only result in the overturning of

a verdict if there was prejudicial impact. *Id*. On the topic of presumptions,[2] the Court stated: "There may be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" *Id*. at 739. In reaching the conclusion that a presumption of prejudice was not appropriate in *Olano*, the Court engaged in a fact-based analysis, and reasoned that the error was not "inherently prejudicial," especially since the lower court gave the alternate jurors an instruction not to participate in the deliberations. *Id*. at 740-41.

---

[2] In *Olano*, the Court's discussion of presumptions was situated in the context of Federal Rule of Criminal Procedure 52(b) analysis, 507 U.S. at 740, which implies the possibility that the presumption at issue in *Olano* was unrelated to the constitutional dictates of *Remmer*. In an earlier portion of the *Olano* opinion, however, the Court relied on constitutional intrusion cases for their reasoning (including *Remmer*), and intimated that the prejudice analysis in those constitutional contexts was analogous to the analysis employed under Rule 52(b). *Id*. at 739. Immediately following a discussion that referenced the prejudice analysis that took place in *Remmer*, the Court clarified that "the issue here is whether the alternates' presence sufficed to establish remedial authority under Rule 52(b), not whether it violated the Sixth Amendment or Due Process Clause, but we see no reason to depart form the normal interpretation of the phrase 'affecting substantial rights,'" which includes prejudice analysis. *Id*.

Taking *Phillips* and *Olano* together, two conclusions seem inescapable: (1) not all suggestions of potential intrusion upon a jury deserve a presumption of prejudice, and thus the government does not always carry the burden of proving prejudice; but (2) there are at least some instances of intrusion upon a jury which call for a presumption of prejudice, contrary to the State's contention. *See Olano*, 507 U.S. at 739 ("There may be cases where an intrusion should be presumed prejudicial . . . ."). Our post-*Olano* case law, both in the habeas and direct-review contexts, is in line with these conclusions. We have interpreted Supreme Court case law as establishing that the *Remmer* presumption is, in fact, vital, though its use should not be automatic regardless of the level of prejudicial impact that is likely to flow from a given intrusion. *See United States v. Gallardo*, 497 F.3d 727, 736 (7th Cir. 2007) ("The facts of this case do not rise to the level of the misconduct in *Remmer*, and no presumption of prejudice is warranted in this case."); *United States v. Warner*, 498 F.3d 666, 680 (7th Cir. 2007) (recognizing a *Remmer* presumption, but noting that "[s]ometimes the circumstances are such that the *Remmer* presumption does not even apply"). What is more, we have implied, though not stated directly, that the *Remmer* presumption is clearly established federal law under AEDPA, meaning state courts must apply the *Remmer* presumption to avoid running afoul of the federal Constitution. *See Moore v. Knight*, 368 F.3d 936, 942-43 (7th Cir. 2004) (stating in a post-AEDPA habeas case reviewing a state court conviction, "The post-conviction court's finding that there was no prejudice was

especially unreasonable due to the fact that a presumption of prejudice applies in situations where *ex parte* communications were made to the jury by a third party"); s*ee also Wisehart*, 408 F.3d at 326-28 (noting in a post-AEDPA habeas case that the State must carry the burden of showing harmlessness in a *Remmer* hearing); *Whitehead v. Cowan*, 263 F.3d 708 (7th Cir. 2001) (holding in a post-AEDPA habeas case that the *Remmer* presumption did not apply due to the innocuous nature of an intrusion upon a jury, implying that the *Remmer* presumption *could* apply in the habeas context).

In *Wisehart v. Davis*, for instance, we considered a habeas petition from a defendant that had been convicted of murder, robbery, burglary, and theft. 408 F.3d at 323. Ten years after the conclusion of that trial, the defendant obtained an affidavit from one of the jurors stating that a third party told the juror that the trial was delayed a day so the defendant could take a polygraph test. *Id*. at 326. The juror never discovered the results of that test. *Id*. Despite this extraneous communication with the juror, the defendant did not receive a hearing to determine whether the juror—and thus the jury—was impartial. *Id*. We determined that under *Remmer*, a hearing was due to the defendant. *Id*. We acknowledged that not every private communication with a juror about a pending trial gives rise to a *Remmer* hearing, since that rule, taken to its extreme, would produce absurd results. *Id*. We did determine, however, that *Remmer* requires further inquiry if an "extraneous communication to [a] juror [is] of a character that creates a reasonable suspicion that further inquiry is

necessary to determine whether the defendant was deprived of his right to an impartial jury," and "[h]ow much inquiry is necessary . . . depends on how likely was the extraneous communication to contaminate the jury's deliberations." *Id*. at 326. This alone is unrelated to whether the *presumption* is clearly established federal law, we also noted that "it was the *state's burden*, given the juror's affidavit, to present evidence that the jury's deliberations had not been poisoned by the reference to Wisehart's having been given a polygraph test." *Id*. at 327-28 (emphasis added). Though we did not specifically state that this rule is "clearly established," *Wisehart* was a post-AEDPA habeas case, and thus the *Remmer* presumption must have been clearly established in order to be relevant under AEDPA. *See* 28 U.S.C. § 2254(d).

Thus, we have already decided that the *Remmer* presumption is clearly established federal law as defined by AEDPA. The State asks us to reconsider our position. It argues that there is a significant circuit split on whether and when the *Remmer* presumption ought to obtain, and thus cannot be considered clearly established law, nor serve to overturn Hall's conviction. The State cites two circuits that held, either explicitly or implicitly, that the *Remmer* presumption no longer exists. *See United States v. Rowe*, 906 F.2d 654, 656 (11th Cir. 1990) ("Prejudice is not presumed. The defendant has the burden of demonstrating prejudice by a preponderance of credible evidence."); *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984) ("In light of *Phillips*, the burden of proof rests upon a defendant to

demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed."). These cases, however, were decided before *Olano* was issued by the Supreme Court. To the extent that they are still good law in their respective circuits, we respectfully conclude that they constitute an unreasonable interpretation of Supreme Court law, given the clear language in *Olano* that explains, "There may be cases where an intrusion should be presumed prejudicial." 507 U.S. at 739.

The State also cites the Tenth Circuit case of *Crease v. McKune*, which held that the *Remmer* presumption is a rule of federal criminal procedure, not constitutional law, and thus is not applicable to the states. 189 F.3d 1188, 1193 (10th Cir. 1999). As is clear from the discussion above, our case law has assumed that the *Remmer* presumption, like *Remmer* hearings generally, is a federal constitutional necessity in the proper factual scenarios. *See Wisehart,* 408 F.3d at 326-28; *Moore,* 368 F.3d at 942-43; *Whitehead,* 263 F.3d 708. *Accord Fullwood v. Lee,* 290 F.3d 663, 678 (4th Cir. 2002) (stating, "We have applied *Remmer* in the federal habeas context," and noting that *Remmer* puts the burden on the State to show prejudice when an improper communication with a juror has taken place). The State has not given us a reason to revisit our position other than the fact that the Tenth Circuit disagrees, and the Tenth Circuit's reasoning does not convince us either. In *Crease*, the Tenth Circuit's sole justification for finding the *Remmer* presumption to be a procedural rule is the fact that "the mere occurrence of an ex parte conversation

between a trial judge and a juror does not constitute a deprivation of any constitutional right." 189 F.3d at 1193 (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1983)). We do not disagree, but we find this point to be unrelated to whether the *Remmer* presumption is a constitutional rule. The fact that an ex parte conversation with a juror does not, by itself, establish a constitutional violation only proves that a *Remmer* presumption, if it exists, is not irrebuttable; it is unrelated to the question of what process is constitutionally due when such an occurrence transpires. Because neither the Tenth Circuit nor the State has given us any reason to depart from our position in *Wisehart*, *Whitehead*, and *Moore*, as well as the fact that *Remmer* hearings themselves undoubtedly serve a constitutional function, *Phillips*, 455 U.S. at 217 ("Due process means a jury . . . decid[ing] the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences . . . . Such determinations may properly be made at a hearing like that ordered in *Remmer* . . . ."), we will continue to follow our established circuit law.

The remainder of inconsistent case law cited by the State relates not to whether the *Remmer* presumption exists, but when the *Remmer* presumption ought to be employed. The State is correct that there has been much debate on this issue. The Fourth Circuit still firmly holds that the *Remmer* presumption is alive and well, provided that "more than innocuous interventions" have taken place. *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996) (quoting *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 n.9 (4th Cir. 1986)). Several other

circuits, such as the D.C. Circuit, have ruled that *Phillips* and *Olano* cut back on *Remmer*'s presumption, but that a presumption can still exist, depending on "whether any particular intrusion showed enough of a 'likelihood of prejudice' to justify assigning the government a burden of proving harmlessness." *United States v. Williams-Davis*, 90 F.3d 490, 497 (D.C. Cir. 1996); *see also United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998). Another has suggested a more firm line: "[T]he presumption is applicable only where there is an egregious tampering or third party communication which directly injects itself into the jury process." *United States v. Boylan*, 898 F.2d 230, 261 (1st Cir. 1990). The Ninth Circuit has provided the narrowest construction, asserting that the *Remmer* presumption is only applicable to jury tampering cases. *United States v. Dutkel*, 192 F.3d 893, 895 (9th Cir. 1999).

Taking these cases together, as well as the actual language used by the Supreme Court, what seems to be "clearly established" is that federal constitutional law maintains a presumption of prejudice in at least some intrusion cases. The standard applied by the Court of Appeals of Indiana requires that a defendant prove that he was probably harmed by an extraneous communication had with a juror, which leaves no room for the potential for a presumption, in contravention of *Remmer* and *Olano*. *See Hall v. State*, 796 N.E.2d 388, 396 (Ind. App. 2003) ("[B]ecause mandatory precedent clearly places the burden of proving prejudice on the defendant, we require Hall to prove he was prejudiced by the misconduct."). Thus, if the intrusion upon Hall's jury would

warrant a presumption of prejudice under any rea-
sonable reading of *Remmer* and its progeny, the Court of
Appeals of Indiana applied a rule that is contrary to
this clearly established federal law, despite the fact that
there is still some ambiguity regarding when the
*Remmer* presumption applies.

To start, we believe that the Ninth Circuit's narrow
interpretation of the *Remmer* presumption is highly ques-
tionable in light of Supreme Court precedent. As noted
above, and as we have recognized in the past, the
Ninth Circuit has limited the *Remmer* presumption to cases
of jury tampering. *See Whitehead*, 263 F.3d at 724 (citing
*Dutkel*, 192 F.3d at 895). In our opinion, whether this is
a reasonable reading of *Remmer* and its progeny depends
upon how "jury tampering" is defined. If "jury tampering"
can be understood to include extraneous contacts
with jurors that are not made with the intention of af-
fecting the jury's verdict, then this limitation placed
upon *Remmer* may be reasonable. If, however, "jury
tampering" is confined to considered attempts
at altering the jury's deliberations or verdict, this inter-
pretation of the *Remmer* presumption is too narrow to
account for the language in both *Olano* and *Remmer*
itself. *Remmer* established a presumption of prejudice
for "any private communication, contact, *or* tampering
directly or indirectly, with a juror during a trial about
the matter pending." 347 U.S. at 229 (emphasis added).
The disjunctive nature of that statement clearly indicates
that the procedural requirements established by *Remmer*
are triggered by more than just tampering cases. One
could reasonably hold—as many circuits have—that

*Phillips* and *Olano* have narrowed *Remmer*, thus creating the possibility that the *Remmer* presumption no longer applies to non-tampering cases. *Olano*, however, was not a tampering case—it involved alternate jurors observing the regular jury's deliberations. If the *Remmer* presumption had been narrowed to apply only to tampering cases, the Court could have disposed of the presumption argument in *Olano* in a single sentence by noting that fact; instead, the Court engaged in a factual analysis to illustrate why the presence of alternate jurors at deliberations is not "inherently prejudicial." *Olano*, 507 U.S. at 740-41. Therefore, the *Remmer* presumption cannot reasonably be understood to apply only to intentional tampering cases in light of the Supreme Court's precedent.

Excluding the Ninth Circuit's potentially problematic interpretation of the *Remmer* presumption, this case falls close enough to the facts of *Remmer* to easily earn a presumption of prejudice under the remaining *Remmer*-presumption tests advanced by the circuits. For one, this case is closer to *Remmer* than it is to *Phillips* and *Olano*. In *Phillips*, the potential bias of a juror was wholly unrelated to the *Phillips* trial itself, but rather involved a relationship between a juror and the prosecutor's office. *Phillips*, 455 U.S. at 212. The potential intrusion in *Olano* was even more innocuous. The possibility of prejudice could have only arisen from the mere presence of alternate jurors during deliberations, rather than any verbal communication, since there was "no specific showing that the alternate jurors in [the] case either participated in the jury's deliberations or 'chilled' delibera-

tions by the regular jurors." *Olano*, 507 U.S. at 739. This case, conversely, involved a third-party communication with a juror about the ultimate question of the pending case to be decided by the jury. Like the phony bribe offer and subsequent FBI investigation in *Remmer*, the information conveyed to Hall's jury could have had a great impact on an average juror's deliberation. The Court of Appeals of Indiana recognized as much when it stated:

> In the case at bar, the extraneous information concerned Hall's fellow inmates' opinions of his innocence and guilt. The fact that the inmates lived with Hall and once believed he was innocent, but changed their belief to guilt, renders the impression that the inmates had a special insight into Hall's guilt—seemingly gained as a result of their frequent contact with Hall and ability to see Hall when he had not composed himself for a jury. As such, if the jury allowed themselves to consider this information, there can be little doubt that the information had a prejudicial impact on the verdict obtained.

*Hall v. State*, 796 N.E.2d at 398. Even under a narrow reading of *Remmer* that permits a presumption of prejudice only where there is a likelihood of prejudice, *Williams-Davis*, 90 F.3d at 497, or where "there is an egregious tampering or third party communication which directly injects itself into the jury process," *Boylan*, 898 F.2d at 261, a presumption was due to Hall in his post-verdict hearing, and the state court decision to the contrary was an abuse of discretion. Thus, we are confident

that despite some ambiguity regarding when the *Remmer* presumption should apply, all reasonable interpretations of *Remmer* and its progeny would lead to a presumption of prejudice in favor of Hall in his post-verdict hearing. Thus, the trial court that oversaw Hall's conviction acted contrary to clearly established federal law under AEDPA.

As it turns out, however, Hall's initial victory is more theoretical than practical, since he still must establish that he was prejudiced by the state courts' constitutional error. Due to the concerns of federalism, finality, and comity that attend habeas proceedings, a habeas petitioner must show that a constitutional error was not harmless to succeed on his petition. *See Basinger*, 635 F.3d at 1052. More specifically, he must show that the constitutional error had a "substantial and injurious effect" on the outcome of his case. *Rodriguez v. Montgomery*, 594 F.3d 548, 551 (7th Cir. 2010). This is, in effect, an "actual prejudice" test. *Basinger*, 635 F.3d at 1052. The *Remmer* presumption is meant to protect against the potential Sixth Amendment harms of extraneous information reaching the jury, but a state court's failure to apply the presumption only results in actual prejudice if the jury's verdict was tainted by such information. *Accord Oliver v. Quarterman*, 541 F.3d 329, 339-41 (5th Cir. 2008) (in a habeas case, finding that "*Remmer, Turner,* and *Parker* clearly establish that it is presumptively prejudicial for a jury to consult an external influence," but that "habeas petitioners are not entitled to relief based on a constitutional error unless the error 'had [a] substantial and injurious effect or influence in determining the jury's verdict'").

Thus, Hall must now prove what he allegedly failed to prove to the Indiana courts: that he was likely prejudiced by the intrusion upon his jury. It is enough, however, that we have a "grave doubt as to the harmlessness of [a constitutional error]" to grant relief. *Basinger*, 635 F.3d at 1052 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995)).

The Indiana courts claim to have made a factual finding that Hall could not show prejudice due to the information that Juror Daniels shared with the rest of Hall's jury. In collateral review, we must "respect the factual findings of state courts." *Green v. Peters*, 36 F.3d 602, 611 (7th Cir. 1994) (citing *Sumner v. Mata*, 455 U.S. 591, 598 (1982)). In fact, "[a] state court's factual findings are 'presumed to be correct' in a federal habeas corpus proceeding unless they are rebutted by 'clear and convincing evidence.'" *Carter v. Thompson*, ___ F.3d ___, 2012 WL 3290152, *1 (7th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)). Upon review of the reasoning behind the state court's "factual determination" regarding prejudice, however, it is clear that the state court did not actually make a factual finding, but rather decided not to decide. As we mentioned previously, the Court of Appeals of Indiana believed that "if the jury allowed themselves to consider [the information about Hall's fellow inmates], there can be little doubt that the information had a prejudicial impact on the verdict obtained." *Hall v. State*, 796 N.E.2d at 398. But Indiana courts, as with federal courts under Federal Rule of Evidence 606(b), are "precluded from considering any information . . . indicating how . . . extrinsic information affected the jury's decision-making process." *Id.* at 397.

The state court determined that there was a lack of proof regarding whether the jurors actually took the highly prejudicial information into consideration when deciding upon their verdict, so no prejudice could be shown. According to the court, "the placement of the burden of proof is everything," and "Hall, as the party with the burden of proof under current Indiana law, necessarily loses." *Id.* at 398. Under this standard of proof, prejudice could never be shown in a scenario where extraneous information has reached a jury, regardless of the level of prejudicial risk, since the court essentially required that Hall present evidence that is literally forbidden under Indiana's—and the federal courts'—procedural rules. What the state courts should have done, at least to satisfy their federal constitutional obligations, is:

> to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that communication took place and what exactly it said, to determine—without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion—whether there is a reasonable possibility that the communication altered their verdict.

*Haugh v. Jones & Laughlin Steel Corp.*, 949 F.2d 914, 917 (7th Cir. 1991). Because the state court judge did not make any determination of this nature, we hold that the court abdicated its duty to make a factual determination regarding the likelihood of prejudice in Hall's case.

In granting Hall's habeas petition, the district court did not require Hall to show prejudice. Instead, it placed the burden of proving harmlessness on the State, and agreed with the Court of Appeals of Indiana that *neither* party could prove harmfulness or harmlessness, so the party with the burden must lose. For the reasons already outlined above, we disagree with both of these decisions. First, it is well established that a habeas petitioner must prove prejudice in order to have his petition granted, *see Brecht*, 507 U.S. at 622; *Basinger*, 635 F.3d at 1052, though we recognize that this point may be counterintuitive given the constitutional error at issue, which is the state courts' failure to place the harmlessness burden on the government in a post-conviction hearing. As already noted, however, this is a consequence of the deference we afford state courts in collateral review. Second, though it may be difficult to prove or disprove prejudice without the benefit of juror testimony regarding the effect of extraneous information on deliberations, it is an abdication of a court's duty to automatically consider the burden of proof to be dispositive in situations of this nature. Thus, what is left for us to decide—if we can—is whether Hall has given us "grave doubt as to the harmlessness" of the Indiana courts' constitutional error. *Basinger*, 635 F.3d at 1052 (quoting *O'Neal*, 513 U.S. at 445).

On the limited record that we have before us, it is clear that Hall has provided enough of a factual foundation, absent any countervailing evidence, to suggest that he was prejudiced by the information acquired and shared by Juror Daniels. Through affidavits,

Hall proved that highly prejudicial information about the ultimate question in his criminal case reached several members of his jury. This, with no further information about the case, gives us "grave doubt as to the harmlessness" of such an intrusion upon Hall's jury. *See Basinger*, 635 F.3d at 1052 (quoting *O'Neal*, 513 U.S. at 445). But in deciding whether extraneous information that reached the jury was likely to have prejudiced a defendant, there is more to consider than just the nature of the extraneous information; a court may also consider, among other things, "the power of [any] curative instructions," *Warner*, 498 F.3d at 681, and the strength of the legitimate evidence presented by the State, *cf. Haugh*, 949 F.2d at 919 (considering the fact that the defendant's trial was "very close" in deciding whether there was a reasonable probability of prejudice). *See also McNair v. Campbell*, 416 F.3d 1291, 1307-08 (11th Cir. 2005) ("[T]he factors to be considered include the heavy burden on the State, the nature of the extrinsic evidence, how the evidence reached the jury, and the strength of the State's case."). If, hypothetically, the legitimate evidence presented by the State in a habeas petitioner's case was overwhelming, and the trial judge in such a case gave a stern pre-verdict warning to the jurors to only consider facts that were presented during trial, concerns about the prejudicial impact of extraneous information might be lessened.

As for Hall's trial, this is information that we do not have and, due to our appellate status, cannot obtain. Thus, while we agree with the district court that the Court of Appeals of Indiana acted contrary to clearly

established federal law, we are uncertain as to whether he was actually prejudiced by the state courts' constitutional error, given the dearth of information before us. It may be a significant challenge for the State to convince the district court that such highly prejudicial information might not have had an impact on the jury's verdict, but this is a matter better addressed by a trial court. We therefore must vacate the district court's grant of Hall's habeas petition and remand to the district court. It is there that the State will have an opportunity to show, despite the strong evidence of prejudice already presented by Hall, that countervailing facts would have alleviated concerns of a prejudiced jury.

## III. Conclusion

For the reasons stated, we REVERSE the judgement of the district court and REMAND for a hearing to determine whether Hall was prejudiced by extraneous information that reached his jury.