[Cite as *Watkins v. Affinia Group*, 2016-Ohio-2830.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102538**

# BARBARA WATKINS, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF GLENN F. WATKINS, DECEASED

PLAINTIFF-APPELLEE

vs.

# AFFINIA GROUP, ET AL.

DEFENDANTS

[Appeal By Honeywell International, Inc.]

**JUDGMENT:**
REVERSED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-12-780871

**BEFORE:** E.T. Gallagher, J., E.A. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** May 5, 2016

**ATTORNEYS FOR APPELLANT**

Steven G. Blackmer
Melanie M. Irwin
Willman & Silvaggio
One Corporate Center
5500 Corporate Drive
Pittsburgh, Pennsylvania 15237

Michael W. Weaver
McDermott Will & Emery, L.L.P.
227 West Monroe St.
Chicago, IL   60606

**ATTORNEYS FOR APPELLEE**

Christopher J. Hickey
Kevin E. McDermott
McDermott & Hickey, L.L.C.
20525 Center Ridge Road, Suite 200
Rocky River, Ohio 44116

Jerome H. Block
Donald P. Blydenburgh
Levy Konigsberg, L.L.P.
800 Third Avenue, 11th Floor
New York, New York 10022

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Honeywell International Inc. ("Honeywell"), appeals a judgment, rendered after a jury trial, in favor of plaintiff-appellee, Barbara Watkins, individually and as executor of the estate of Glenn Watkins. Honeywell raises the following four assignments of error:

> 1. The trial court committed reversible error by permitting plaintiff's causation experts to testify, over defendant's objections in limine renewed during trial, that (1) each or every exposure of asbestos is a substantial contributing cause of pleural mesothelioma; (2) if a person develops mesothelioma and there is evidence of any asbestos exposure from a product (regardless of fiber or dose), then the disease was caused by asbestos from the identified products; (3) plaintiff's mesothelioma was caused by exposure to brake dust.

> 2. The trial court committed reversible error when it gave the jury a cautionary instruction during trial over defendant's objection which, contrary to R.C. 2307.954(B), stated that a plaintiff receives only partial compensation from bankruptcy trust claims and that the usual rules of evidence and proof of causation have been eased with respect to these claims.

> 3. The trial court committed reversible error by permitting plaintiff's expert witnesses, over defendant's in limine objection renewed at trial, to testify concerning a publication entitled "Asbestos Exposure Causes Mesothelioma, But Not This Asbestos Exposure: An Amicus Brief to the Michigan Supreme Court" by Laura S. Welch, et al., Int. J. Occup. Environ. Health 2007; 13:318-27, both because the article is hearsay for which there is no valid exception to its exclusion and pursuant to Evid.R. 403, the article should have been excluded because any probative value contained in the article was substantially outweighed by one of three dangers: unfair prejudice, confusion of the issues, or misleading the jury.

> 4. The trial court committed reversible error by denying defendant's motion for directed verdict as to plaintiff's statutory claim for design defect, because plaintiff failed to offer any evidence as required by R.C.

2307.75(F) that a feasible alternative formulation existed with respect to the asbestos utilized in the defendant's brakes at issue.

**{¶2}** We find merit to the appeal and reverse the trial court's judgment.

## I. Facts and Procedural History

**{¶3}** The facts giving rise to this asbestos litigation are not in dispute. Glenn Watkins ("Glenn") was employed at Babcock & Wilcox in Barberton, Ohio from 1957 to 1958, where he was exposed to rolls of asbestos insulation and asbestos pipe covering. Owens Corning Fiberglass sold the insulation to the Babcock facility while Glenn worked there. The insulation, known as "Kaylo" insulation, contained amphibole asbestos fibers.

**{¶4}** Glenn testified that his work required him to routinely transport materials from a warehouse to a Ford shop. The warehouse was filled with dust because other workers were packing the asbestos-containing insulation to be used on boilers and other products. The asbestos products included pipes and sheets of asbestos. Glenn and Barbara Watkins sued Babcock & Wilcox as well as the manufacturers of the asbestos containing products that were present in the warehouse.

**{¶5}** During the late 1950s and 1960s, Glenn used Georgia-Pacific and Gold Bond joint compound on construction projects. He testified that he mixed the joint compound and applied it to drywall. When the compound had dried, he sanded it, and the sanding generated large amounts of dust. (Glenn Watkins Depo. Vol. I 34.) As part of this lawsuit, Glenn sued the manufacturers of these joint compounds because they were known to contain asbestos.

{¶6} Sometime in 1950 or 1951, Glenn installed a Hollins Furnace in his home. As part of the installation, Glenn and his father wrapped the furnace and pipes with insulation. They also installed insulation under the floor. They cut the insulation into pieces, and Glenn held each piece on the furnace while his father secured it to the furnace with wire. Glenn explained: "And when you cut the insulation, you could see a lot of fiber coming off of it and it was very dusty." (Glenn Watkins Depo. Vol. I 31.) Glenn further stated that he handled the insulation for 12 hours by the time the project was completed. (Glenn Watkins Depo. Vol. I 33.)

{¶7} In 1985, Glenn began working as a manager at various Auto Shack and AutoZone retail stores (collectively referred to as "AutoZone"). AutoZone sold a variety of auto parts, including gaskets and "aftermarket" brakes. The brakes were produced by several different manufacturers, including Morse, ValueCraft, Duralast, Carilac, Albany, and Bendix. (Glenn Depo. Vol. I 42.) Glenn recommended that customers sand the brakes before installation to avoid squeaking. Glenn estimated that he sanded approximately 400 brake shoes and 700 to 800 brake pads for customers between 1985 and 2006. Sanding and scuffing brakes created visible dust in his work area that he cleaned with a dry broom or vacuum cleaner. He testified that sweeping and vacuuming the dust generated more airborne dust.

{¶8} AutoZone also sold asbestos-containing gasket intake and exhaust manifolds. As part of his work, Glenn handled intake gaskets two to three times per day. (Glenn Watkins Depo. Vol. I 43.) He also handled exhaust gaskets two to three times per day.

*Id.* All together, Glenn handled approximately 25,000 gaskets from 1985 to 2001. These gaskets were manufactured by Fel-Pro, McCord, and Victor. (Glenn Watkins Depo. Vol. I 44.)

{¶9} In addition to his work at AutoZone, Glenn testified that he performed brake jobs on his vehicles. After removing the old brakes, Glenn cleaned dirt and dust from the vehicle and sanded the new brakes before installing them. Glenn testified that most of the dust and dirt came from the brake shoes. (Glenn Watkins Depo. Vol. I 45.) Glenn changed brakes on numerous cars over the course of several decades, but installed mostly Duralast brakes. He stated: "Once you start using Duralast, that's all I used." (Glenn Watkins Depo. Vol. I 50.) The Bendix brakes at issue in this case were thought to contain chrysotile asbestos fibers as opposed to the amphibole asbestos contained in some of the other products.

{¶10} Glenn began rebuilding engines in 1951 and continued until 2000. As part of this process, Glenn removed and installed new engine and exhaust gaskets. He testified that whenever he removed a new gasket from the box, "there was always fiber and dust coming out and it would get airborne." (Glenn Watkins Depo. Vol. I 53.)

{¶11} In January 2012, Glenn Watkins was diagnosed with pleural mesothelioma, which is a cancer of the protective lining of the lungs. Glenn and Barbara Watkins ("Watkins") filed a complaint against Honeywell, as successor-in-interest to the Bendix Corporation, as well as several other manufacturers of asbestos-containing products. They alleged that Glenn developed mesothelioma as a result of exposure to the

defendants' asbestos-containing products. As relevant to this appeal, Watkins alleged that Glenn was exposed to chrysotile asbestos in the brakes manufactured by Bendix, and that this exposure was a substantial cause of his disease. Glenn died shortly after the complaint was filed.

{¶12} All the defendants except Honeywell settled, or were otherwise dismissed, before trial. The issue at trial was whether Glenn's handling of Bendix brakes was a cause-in-fact of Glenn's mesothelioma and, if so, by how much. Watkins's two causation experts, Drs. James A. Strauchen ("Dr. Strauchen") and Arthur L. Frank ("Dr. Frank") shared the opinion that Glenn's exposure to Bendix brakes was a substantial cause of his mesothelioma.

{¶13} Prior to trial, Honeywell moved in limine to exclude Drs. Frank and Strauchen from testifying or, in the alternative, requested a *Daubert* hearing to examine the reliability of their opinions. Honeywell argued the experts' opinions were not based on reliable science because their "every exposure" and "cumulative dose" theories are not based on scientifically defensible principles and methodologies.

{¶14} Honeywell also sought to exclude from the evidence, an amicus brief that was later published in a medical journal titled, "Asbestos Exposure Causes Mesothelioma, But Not This Asbestos Exposure: An Amicus Brief to the Michigan Supreme Court" (the "Welch article"). Honeywell argued the Welch article is hearsay for which there is no valid exception. It also argued the article was misleading to the

jury, and that its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues.

{¶15} The trial court denied both motions in limine without a *Daubert* hearing. Watkins's experts testified that Glenn's exposure to chrysotile asbestos in Bendix brakes was a substantial contributing cause of his mesothelioma.

{¶16} At the conclusion of Watkins's case-in-chief, and again at the conclusion of the evidence, Honeywell moved for a directed verdict, arguing that Watkins's experts failed to prove Glenn's handling and sanding of Bendix brakes exposed him to sufficient levels of chrysotile asbestos to cause his disease. The trial court denied the motion, along with a few others not relevant to our decision here, and the case was submitted to the jury.

{¶17} After nearly two days of deliberations, the jury returned a verdict in favor of Watkins. The jury apportioned fault to each of the named defendants and found that Honeywell was 40% responsible for Watkins's mesothelioma. Honeywell now appeals the trial court's judgment.

## II. Law and Analysis

### A. Causation Expert Testimony

{¶18} We find the first assignment of error dispositive of this appeal. In this assigned error, Honeywell argues the trial court erred by permitting Watkins's causation experts to testify, over objection, that Glenn's mesothelioma was caused by exposure to

Bendix brake dust. Honeywell contends the experts' testimony did not comply with either Evid.R. 702 or the *Daubert* standard for the admissibility of expert evidence.

### 1. The *Daubert* Standard

**{¶19}** The admissibility of expert testimony in Ohio is governed by Evid.R. 702 and 703, and the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998) (Ohio has adopted the *Daubert* test for determining the reliability of an expert's opinion.).

**{¶20}** Evid.R. 702 permits a witness to testify as an expert only if his opinion or testimony will aid the trier of fact in the search for truth. *State v. Clark*, 101 Ohio App.3d 389, 655 N.E.2d 795 (8th Dist.1995). An expert's testimony assists the trier of fact if it meets a threshold standard of reliability. *Daubert* at 589-590. *See also* 1994 Staff Notes to Evid.R. 702. Thus, the trial court should not accept the expert's opinion at face value; it must independently examine and evaluate the reliability of each expert's opinion. *Walker v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, ¶ 27.

**{¶21}** *Daubert* provides the analytical framework for determining whether expert testimony is sufficiently reliable to be admissible under Evid.R. 702. Under *Daubert*, experts may only testify if their testimony is (1) based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has

applied the principles and methods reliably to the facts of the case. *Daubert* at 592-593; Evid.R. 702.

{¶22} In *Daubert*, the court enumerated several non-exhaustive factors courts must consider when determining whether scientific evidence is reliable. *Id*. at 593-594. These factors include (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. *Id*. at 593-594. These factors are intended to assist the trial court in its duty to ensure that expert testimony is based on the scientific method. *Id*. at 590. The *Daubert* court explained that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id*.

{¶23} In defining the scientific method, the *Daubert* court stated that "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id*. at 593. Thus, the focus of the *Daubert* inquiry is "solely on principles and methodology, not on the conclusions that they generate." *Daubert* at 595. *See also Bike Athletic Co.*, 80 Ohio St.3d 607 at 611, 687 N.E.2d 735.

{¶24} In the remanded Ninth Circuit *Daubert* opinion, the court recognized that as evidentiary gatekeepers, trial courts must now "analyze not what the experts say, but what basis they had for saying it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d

1311, 1316 (9th Cir.1995). This examination "will require some objective, independent validation of the expert's methodology." *Id.*

**{¶25}** The proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard by a preponderance of the evidence. *Walker*, 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208 at ¶ 25.

## 2. *Daubert* Analysis

**{¶26}** Drs. Frank and Strauchen opined that Watkins's handling and sanding of Bendix brakes was a substantial cause of his mesothelioma. Despite Watkins's statements to the contrary, their opinions were premised on the notion that every exposure to asbestos is a substantial contributing cause to the development of mesothelioma. They asserted that because asbestos disease is a cumulative, dose-response process, every exposure the person experiences during his lifetime substantially contributes to the disease.

**{¶27}** To properly evaluate the admissibility of these opinions, some understanding of toxicology, as it relates to the law of torts, is necessary. "All substances are poisonous — there is none which is not; the dose differentiates a poison from a remedy." David L. Eaton, *Scientific Judgment and Toxic Torts — A Primer in Toxicology for Judges and Lawyers*, 12 Journal of Law & Policy 11 (2003). Alcohol, aspirin, sunlight, vitamins, and minerals are not harmful, and may be beneficial at low levels, but can cause harm in higher doses. Again, it is "the dose that makes the poison."

Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology*, Reference Manual on Scientific Evidence 401, 403 (West Group 2d Ed.2000).

{¶28} The threshold at which a substance becomes poisonous is not always easy to identify, but that does not mean it does not exist. Unless the plaintiff is exposed to a toxic level of a substance, the substance will not cause the plaintiff any harm. *Id.* To prove causation in toxic tort cases, courts generally require the plaintiff to demonstrate more than just some exposure; he must produce evidence from which the trier of fact can conclude that the plaintiff was exposed to sufficient levels of toxins to cause the plaintiff's injury. *Wintz v. Northrop Corp.*, 110 F.3d 508, 513 (7th Cir.1997), citing Reference Manual on Scientific Evidence (1994); *see also Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir.1996); *McClain v. Metabolife Intl., Inc.*, 401 F.3d 1233, 1241 (11th Cir.2005); *Allen v. Pennsylvania Eng. Corp.*, 102 F.3d 194, 199 (5th Cir.1996) ("[S]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden."). *See also Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, paragraph one of the syllabus.

{¶29} As previously stated, Evid.R. 702 and *Daubert* hold that an expert's opinion must be based on sufficient facts and data in order to aid the jury in its search for truth. *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Drs. Frank's and Strauchen's theories are supported by certain general conclusions that are not in dispute. These conclusions are that (1) both amphibole and chrysotile asbestos fibers are carcinogenic,

(2) amphibole asbestos is a more potent carcinogen than chrysotile asbestos, (3) almost all mesothelioma cancers are caused by asbestos exposure, (4) prolonged exposures to large doses of asbestos increase the likelihood of cancer, and (5) there is no known minimum dose of asbestos that is required to cause cancer in a human being.

{¶30} These factors tend to prove general causation, which is a methodology used to determine whether or not exposure to a substance or agent is capable of producing an adverse health effect in humans. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 13. Specific causation is a methodology used to determine whether or not exposure to a particular substance did, in fact, cause the plaintiff's specific disease. *Id.* at ¶ 15. "Specific causation separates the speculative from the probable." *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 773 (Tex.2007).

{¶31} *Borg-Warner* involved a retired brake mechanic who developed asbestosis after working in the automotive department of a Sears store for 35 years. *Id.* at 766. The plaintiff regularly sanded brakes to avoid "brake squealing" after installation, and the grinding process produced visible dust. The brakes contained between 27 and 28 percent asbestos. The Texas Supreme Court held that the plaintiff failed to establish a causal connection between the plaintiff's disease and the brake dust beyond mere speculation. The court reasoned:

> [W]hile some respirable fibers may be released upon grinding some brake pads, the sparse record here contains no evidence of the approximate quantum of Borg-Warner fibers to which Flores was exposed, and whether this sufficiently contributed to the aggregate dose of asbestos Flores inhaled, such that it could be considered a substantial factor in causing his asbestosis.

*Id.*

> "It is not adequate to simply establish that 'some' exposure occurred. Because most chemically induced adverse health effects clearly demonstrate 'thresholds,' there must be reasonable evidence that the exposure was of sufficient magnitude to exceed the threshold before a likelihood of 'causation' can be inferred."

*Id.*, quoting David L. Eaton, *Scientific Judgment in Toxic Torts — A Primer in Toxicology for Judges and Lawyers*, 12 Journal of Law & Policy at 39.

**{¶32}** We note that the *Borg-Warner* court further held that a causation expert need not identify a particular dose with mathematical precision. *Id.* at 772-773. "Defendant-specific evidence relating to the approximate dose to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the asbestos-related disease, will suffice." *Id.* The Fourth Circuit has also held that plaintiffs are not required to identify a specific dose. *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir.1986). In what has become known as the *Lohrmann* test, the court held that substantial causation may be inferred from circumstantial evidence of "(1) exposure to a specific product (2) on a regular basis (3) over some extended period of time (4) in close proximity to where the plaintiff actually worked." *Id.*

**{¶33}** Drs. Frank and Stauchen asserted that asbestos is the only proven cause of mesothelioma and that every exposure to asbestos increases an individual's risk of developing an asbestos-related disease. However, the trial court did not hold a *Daubert* hearing, and thus could not independently determine whether Drs. Frank's and

Strauchen's causation theories were supported by sufficient data or based on reliable principles and methods.

{¶34} The record contains some epidemiological studies, but there is no evidence about how these studies were conducted. Were there any biases in the selection of studied subjects? Were there any systematic errors in measuring data that resulted in differential accuracy of information? Who funded the studies? There are numerous questions the court could ask the experts regarding the reliability of these studies. The court must consider biases when interpreting an epidemiological study. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 719 (Tex.1997) ("[B]ias can dramatically affect the scientific reliability of an epidemiological study.").

{¶35} Dr. Frank also based his opinion, in part, on the "Helsinki Criteria," which was a report created by a group of 19 interdisciplinary scientists to establish criteria for attributing lung cancer and mesothelioma to asbestos exposure. *See Asbestos, Asbestosis, and Cancer: The Helsinki Criteria for Diagnosis and Attribution*, 23 Scandinavian Journal of Work Environmental Health, 311, 312-314 (1997).

{¶36} As for mesothelioma, the Helsinki Criteria states that

[a] lung fiber count exceeding the background range for the laboratory in question or the presence of radiographic or pathological evidence of asbestos-related tissue injury (e.g., asbestosis or pleural plaques) or histopathologic evidence of abnormal asbestos content (e.g. asbestos bodies in histologic sections of lung) should be sufficient to relate a case of pleural mesothelioma to asbestos exposure on a probability basis. In the absence of such markers, a history of significant occupational, domestic, or environmental exposure to asbestos will suffice for attribution.

*Id*. at 313.

**{¶37}** However, courts have criticized the validity of the Helsinki Criteria on grounds that the criteria are "concerned only with whether mesothelioma can be attributed to asbestos as a general matter." *Yates v. Ford Motor Co.*, 113 F.Supp.3d 841, 862 (E.D.N.C.2015). The *Yates* court observed that "[t]he Helsinki Criteria does not articulate principles for distinguishing which particular 'occupational, domestic or environmental exposure[s] to asbestos' caused the disease." *Id.*, quoting *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 27, 712 S.E.2d 537 (2011).

**{¶38}** Moreover, "[t]o the extent the Helsinki Criteria does not require an expert to establish the levels at which the particular fiber type of asbestos presents a risk, the criteria cannot substitute for the well-established and legally recognized methods of determining when a substance is hazardous." *Id.* Therefore, in the absence of a hearing, the trial court did not have sufficient evidence upon which to analyze the basis for Watkins' experts' opinion.

**{¶39}** The trial court did not properly execute its duty as gatekeeper because, without a hearing, the court could not independently examine and evaluate the reliability of Drs. Frank's and Stauchen's expert testimony. Therefore, their testimony was admitted in error.

**{¶40}** The first assignment of error is sustained.

**{¶41}** Judgment reversed.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MELODY J. STEWART, J., CONCUR